IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:24CR155 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | |
| | ) | |
| THOMAS TAYLOR, | ) | GOVERNMENT'S RESPONSE IN |
| | ) | OPPOSITION TO DEFENDANT'S |
| Defendant. | ) | MOTION TO SUPPRESS |

Now comes the United States of America, by and through its counsel, Rebecca C. Lutzko, United States Attorney, and Payum Doroodian, Assistant United States Attorney, and hereby responds in opposition to Defendant Thomas Taylor's Amended Motion Suppress. (R. 20: Amended Motion to Suppress, PageID 149-170). Taylor lacks standing to challenge the search warrants. Even if Taylor had standing, the affidavits, totaling an astounding 133 pages, contain extensive evidence supporting probable cause to believe that evidence of criminal conduct is present at each residence. Additionally, Taylor's Motion is unsupported by facts and law and further fails to present any evidence whatsoever to support his bare claim of a false statement within the affidavits, much less one that was knowingly or intentionally made. Therefore, this Court should deny Taylor Motion without a *Franks* hearing.

## I.   FACTUAL BACKGROUND

In late March 2024, after reviewing a total of 133 affidavit pages, United States Magistrate Judge James E. Grimes Jr. approved a total of four residential search warrants in connection with this case. Those residences, in the sequence that they were approved, include the following: a residence on Dove Avenue, Cleveland, Ohio 44120 (*see* Gov't Ex. 1); a residence on East 134th St., Cleveland, Ohio 44120 (*see* Gov't Ex. 2); a residence on Ridgewood Dr.,

Twinsburg, Ohio 44087 (*see* Gov't Ex. 3); a residence on Stockbridge Ave., Cleveland, Ohio

44128 (*see* Gov't Ex. 4). The first two search warrants above authorized the search for controlled

substances, paraphernalia, and other drug making tools. In contrast, the latter two search

warrants authorized the search for drug proceeds, records, ledgers, and phones. The affidavits

also documented the following individuals as owning and/or living in each residence: Michael

Anderson at the Dove Avenue address, Noreece Young at the East 134th Street address, Thomas

Taylor at the Ridgewood Drive address, and Marcia Hawkins at the Stockbridge Avenue address.

In support of the four search warrants, the Affiant FBI TFO Shaun Stanton provided the

following facts:[1]

### A.      Overview of the Investigation.

Through an extensive investigation completed by the FBI's Cartel, Gang, Narcotics, and

Laundering (CGNL) Task Force and Southeast Area Law Enforcement (SEALE) Detectives that

spanned two years and utilized numerous established investigative methods, agents discovered

that Thomas Taylor operates a large-scale drug trafficking operation (DTO) in the Northern

District of Ohio. The Taylor DTO sells numerous different types of narcotics and also

specifically manufactures blue fentanyl pills using a large industrial pill press. Consistent with

other large scale drug traffickers, Taylor limits direct interactions with customers, utilizing

middlemen and other means to avoid law enforcement detection. Taylor also compartmentalizes

his drug trafficking activity by manufacturing in a location different than where narcotics are

sold, while also keeping different residences for drug proceeds and other paperwork related to

the conspiracy. As detailed in the affidavits, the Taylor DTO routinely used Young's residence at

---

[1] The affidavits for the four residences are separately filed under seal in accordance with the
Court's previously issued protective order. *See* Gov't Ex. 1-4.

East 134th Street to sell narcotics and used Anderson's residence at Dove Avenue to manufacture narcotics.  Meanwhile, Taylor's Ridgewood residence, which he now disavows connection to in his latest Motion, as well as Hawkin's Stockbridge residence is where drug proceeds and records of drug activity were believed to kept.

**B.      Identification of Taylor by numerous reliable informants**

Two years before the search warrants were issued in this case, investigators received reliable information from two known drug traffickers and five confidential informants, all of which have been proven reliable in other investigations where their information directly led to successfully controlled buys and the seizure of narcotics.

Specifically, in 2022, a confidential reliable informant (CRI 1) told SEALE detectives that Defendant Taylor was selling cocaine, fentanyl, and pills near Kinsman Ave. A criminal records check of Taylor confirmed Taylor's extensive criminal history that included 36 arrests and cases since 2001, and previous convictions for the following serious crimes: possession of drugs (felony) in 2002, grand theft in 2006, drug trafficking in 2007, having weapons while under disability in 2010, aggravated menacing in 2010, assault in 2010, domestic violence in 2010, having weapons while under disability in 2010, drug trafficking in 2013, possessing criminal tools in 2013, and felon in possession of a firearm in 2018 in the Northern District of Ohio.

In addition, in late 2022, during a drug trafficking investigation into a drug trafficker, SEALE detectives interviewed the target who identified Taylor as selling large quantities of heroin in northeastern Ohio. The target went further and told officers the exact address of Taylor's "money house," that being Hawkin's Stockbridge Avenue residence. During the meeting and subsequent meetings with the target, the target provided valuable information which

led the investigation and successful prosecution of multiple individuals.  As such, investigators found the target's information to be proven reliable in other cases.

In early 2023, another confidential reliable informant (CRI 2) told SEALE detectives that Taylor was selling cocaine and fentanyl near Kinsman Ave. Later in mid-2023, during the execution of multiple federal search warrants related to another narcotics trafficker, SEALE detectives interviewed the target of that investigation. The target told them that the several kilograms of narcotics found in the residence searched was supplied to him by Taylor and positively identified Taylor through a photograph.

In early 2024, a third unrelated confidential reliable informant (CRI 3) positively identified Taylor and told SEALE detectives that Taylor was selling cocaine, fentanyl, pills, and methamphetamine in northern Ohio. He also provided Taylor's phone number as 216-644-6515. Additionally, CRI 3 also positively identified the East 134th Street as where Taylor stored, manufactured, and broke down his narcotics for sale. CRI 3 said this residence was actually owned by Taylor's brother Trevis Taylor, which investigators confirmed through the Cuyahoga County Fiscal Office. CRI 3 also identified several of Taylor's coconspirators, all of which had prior drug trafficking convictions and were observed by officers with Taylor around the East 134th Street residence.

In early 2024, a fourth unrelated confidential reliable source (CRI 4) also told SEALE detectives that narcotics were being trafficked out of the East 134th Street address and the CRI 4 stated that they purchased narcotics from the residence from a person named "Gary." A subpoena of Taylor's phone tolls later showed numerous calls between "Gary" and Taylor.

### C.    Surveillance on Taylor in January/February 2024

Starting in January 2024, investigators began daily surveillance of Taylor and the residences above. In addition, investigators used area license plate readers for vehicles used by

Taylor to confirm that Taylor traveled to the Ridgewood Drive address every night and departed every morning. During their observations of the East 134th Street address, investigators observed on numerous days Taylor present and meeting with known drug traffickers outside the residence for short visits in and around Taylor's vehicle.

Further, on one occasion in February, officers observed Taylor travel from the nearby Kinsman Avenue to the East 134th Street address using erratic driving behavior consistent with counter-surveillance. After meeting with a known drug trafficker, Taylor then traveled with the drug trafficker to the Dove Avenue address, where they both entered the residence. Through the Cuyahoga County Fiscal Office, investigators determined that the Dove Avenue residence was owned by Michael Anderson, who received the residence from a quit claim deed from Taylor's brother, Trevis Taylor. Daily surveillance of the Dove Avenue address also revealed that Taylor's vehicle was often present.

On another occasion in February, investigators followed Taylor from his Ridgewood Drive residence to a location in Cleveland, Ohio and meet with an unidentified male. This male gave Taylor a duffle bag and Taylor traveled directly to the East 134th Street address where Taylor entered the residence and exited the residence after a few minutes. Taylor then traveled to Stockbridge Avenue address, where Taylor again entered the residence and exited the residence after a few minutes. Taylor then traveled back to East 134th Street address where Taylor entered the residence.

In late February 2024, officers again observed Taylor repeatedly travel between East 134th Street and Dove Avenue on the same day, followed by brief meetings with known drug traffickers at his vehicle before returning home to Ridgewood Drive.

In total, through the use of daily physical and aerial surveillance, telephone pings, and GPS trackers obtained through a warrant signed on February 21, 2024, and March 11, 2024,

officers determined that Taylor frequently visits the Stockbridge Avenue, East 134th Street, and Dove Avenue address multiple times a day and often for short visits. On each occasion, Taylor travels alone and appears to meet with known drug traffickers and co-conspirators in order to facilitate his drug trafficking operation. On multiple occasions, these drug traffickers are seen with duffle bags and unidentified items after meeting with Taylor.  The affidavits detail more than two dozen occasions where Taylor traveled to the search warrant locations in a manner consistent with drug trafficking.

**D.      Background to Controlled Purchases from Taylor**

In late February 2024, investigators were informed by another unrelated confidential reliable informant (CRI 5) about Taylor's large scale drug trafficking activities in northern Ohio. CRI 5 correctly identified Taylor by a photograph, as well as Taylor's phone number as 216-644-6515 and the multiple vehicles used by Taylor. CRI 5 also was proven reliable in other investigations through providing information corroborated through controlled buys, trash pulls, and surveillance.  In particular, CRI 5 confirmed that CRI 5 has previously purchased narcotics from Taylor and could purchase more narcotics from Taylor.

**E.      First Controlled Buy**

During the week of February 26, 2024, detectives and FBI agents set up a controlled buy from Taylor with CRI 5. Before meeting with CRI 5, CRI 5 told detectives that Taylor had fentanyl ready for CRI 5. CRI 5 also told detectives that Taylor usually "fronts" the drugs to his customers and expects payment for the drugs later. Taylor would leave the narcotics at the Noreece Young's residence on East 134th Street for people to pick up. On a recorded line, CRI 5 called one Taylor's co-conspirator, Young, and Young told CRI 5 that Taylor had left the narcotics he intended to sell to CRI 5 at his house. Young also told CRI 5 that Taylor told Young that CRI 5 still needed to pay for a prior debt in addition to the sale.

The following day, investigators met with CRI 5 to complete the transaction. Investigators searched CRI 5 and gave CRI 5 pre-recorded buy money as well as a covert audio/video recording device. They set up surveillance around the East 134th Street residence and followed CRI 5 directly to the house and watched CRI 5 enter the house after meeting with Young. Inside the residence, CRI 5 gave Young the buy money in exchange for the fentanyl. While CRI 5 was in the residence, Taylor contacted Young via a Facetime video call to discuss the sale to CRI 5. This call was captured on the covert audio/video equipment. Taylor informed Young and CRI 5 that more drugs would be available soon and discussed selling a pill press. After leaving the residence, CRI 5 immediately met with detectives where detectives seized the narcotics and again searched CRI 5. A field-test confirmed that the narcotics contained fentanyl, with an approximate weight of 1.3 kilograms. Investigators maintained constant surveillance on CRI 5 throughout the controlled buy and reviewed the covert audio/video recording and found it to be consistent with what was observed that day.

In addition, the Affiant reviewed the GPS tracking information for Taylor and discovered that directly before the CRI 5 arrived at the East 134th Street residence, Taylor traveled from the Dove Avenue residence directly to East 134th Street residence. In addition, after Taylor arrived at the East 134th Street residence, Young called CRI 5 to tell CRI 5 that the drugs were ready for pickup. Taylor then departed before CRI 5 arrived at the residence and traveled to the Stockbridge residence for six minutes before traveling to the Ridgewood Drive residence for the evening.

**F.        Second Controlled Buy**

During the week of March 5, 2024, detectives and FBI agents set up another controlled buy from Taylor with CRI 5. Prior to the controlled buy, both Young and Taylor directly communicated with CRI 5. Young told CRI 5 that Taylor was presently at the East 134th Street

residence and the fentanyl was ready for pickup. In reviewing the timestamps of those text messages, investigators confirmed via surveillance and GPS data that Taylor was indeed present at East 134th Street during the messages. In addition, Taylor also called CRI 5 via Facetime video call and discussed with CRI 5 the drugs presently at East 134th Street and how to order a pill press through the mail using Bitcoin payments. This call was recorded and reviewed by investigators and confirmed to be Taylor. This call was also documented on Taylor's phone toll reports.

As with the previous controlled buy, investigators first searched CRI 5 and gave CRI 5 pre-recorded buy money for the previous buy as well as a covert audio/video recording device. Investigators set up surveillance around the East 134th Street residence and followed CRI 5 directly to the house and watched CRI 5 enter the house after meeting with Young. Inside the residence, CRI 5 gave Young the buy money in exchange for the fentanyl. After leaving the residence, CRI 5 immediately met with detectives where detectives seized the narcotics and again searched CRI 5. A field-test confirmed that the narcotics contained fentanyl, with an approximate weight of 1 kilogram. Investigators maintained constant surveillance on CRI 5 throughout the controlled buy and reviewed the covert audio/video recording and found it to be consistent with what was observed that day.

In addition, the Affiant reviewed the GPS tracking information for Taylor and discovered that directly before the CRI 5 arrived at the East 134th Street residence, Taylor traveled from the Dove Avenue residence directly to East 134th Street residence. In addition, one minute after Taylor arrived at the East 134th Street residence, Young called CRI 5 to tell CRI 5 that the drugs were ready for pickup. Taylor then traveled to the Stockbridge residence for a few minutes before traveling to the Ridgewood Drive residence for the evening. In addition, the day prior to the second controlled purchase, Taylor made multiple trips between the residences as East 134th

8

Street, Dove Avenue, and Stockbridge Avenue. Such movements by Taylor were indicative of the movement of narcotics and drug proceeds.

Following the second controlled buy, investigators met with CRI 5 again for CRI 5 to pay Taylor for the previous controlled buy. Consistent with the other controlled buys, officers first searched CRI 5 and gave CRI 5 pre-recorded buy money as well as a covert audio/video recording device. They set up surveillance around the East 134th Street residence and followed CRI 5 directly to the house and watched CRI 5 enter the house and pay Young for Taylor's narcotics. Investigators maintained constant surveillance on CRI 5 throughout the money drop and reviewed the covert audio/video recording and found it to be consistent with what was observed that day. CRI 5 was again searched after the interaction and found to not have any cash or narcotics.

After the second controlled buy, investigators obtained additional warrants for Taylor's vehicle and cell phone location data on March 10 and 11, 2024. This data showed that in the evening of March 11, 2024, Taylor stayed at the Dove Avenue residence for approximately 9 hours before traveling at 3:00 am to the East 134th Street address and then to the residence at Ridgewood Drive.

### G.    Recorded Call with Taylor on March 12, 2024

On March 12, 2024, investigators obtained a recorded Facetime video call between CRI 5 and Taylor. During the call, Taylor told CRI 5 that Taylor was out late the night before (March 11, 2024) pressing fentanyl pills with a heavy, 3-4 foot tall industrial pill press and had to stop due to the fumes and dust created by pressing the pills. This information was consistent with GPS and other location data that showed Taylor at the Dove Avenue address until 3:00am on that evening. During the call, Taylor also told CRI 5 that he sold some fentanyl that night, but he still

had some left for CRI 5. Taylor further stated he would complete the sale, or he would have Noreece Young complete the sale.

### H.    Third Controlled Buy

Detectives again met with CRI 5 in order to complete another controlled purchase of fentanyl from Taylor. Consistent with the other buys, investigators searched CRI 5, and provided pre-recorded buy money to pay off the previous buy as well as an audio/video recording device. Meanwhile, investigators set up surveillance both at the Dove Avenue address and the East 134th Street address. Different investigators then followed CRI 5 directly to the East 134th Street address, where CRI 5 met with Young and provided Young with the buy money. Prior to CRI 5's arrival, surveillance and location data showed Taylor travel from the Ridgewood Drive address to the East 134th Street address and enter and exit the residence after a short period. Taylor then traveled to the Dove Avenue residence before CRI 5 arrived at the East 134th Street address. While CRI 5 was in the residence, Young told CRI 5 that Young was going to deliver the money to Taylor at Taylor's bar. Both Young and CRI 5 then left the residence separately. While CRI 5 was traveling to the debriefing location, Taylor initiated a Facetime video call with CRI 5, which was captured with the covert audio/video recording equipment. During the call, Taylor asked if Young and CRI 5 were still at the East 134th Street residence. CRI 5 told Taylor that they were no longer at the residence, and Young was meeting Taylor at the bar. Taylor then told CRI 5 that he would give Young the fentanyl that CRI 5 requested at the bar or leave it at the East 134th Street residence. Through direct surveillance and other location data, investigators observed as Taylor left the Dove Avenue residence and traveled to Taylor's bar at the same time that Young was at the bar. Taylor then departed and traveled to the Ridgewood Drive residence for the evening.

The following day, investigators met with CRI 5 in order to complete the controlled purchase of fentanyl from Taylor. Consistent with the other buys, investigators searched CRI 5, and provided an audio/video recording device to record the interaction. Investigators then followed CRI 5 to the East 134th Street residence, where CRI 5 met with Young, who provided CRI 5 the fentanyl. After leaving the residence, CRI 5 immediately met with detectives where detectives seized the narcotics and again searched CRI 5. A field-test confirmed that the narcotics contained fentanyl, with an approximate weight of 100 grams. Investigators maintained constant surveillance on CRI 5 throughout the controlled buy and reviewed the covert audio/video recording and found it to be consistent with what was observed that day.

## I.       Recorded Call with Taylor while Taylor was Pressing Pills

Immediately after the third controlled purchase, investigators observed Taylor travel to and enter the Dove Avenue residence. Shortly thereafter, another male arrived at the residence, which CRI 5 previously told investigators was known to assist Taylor with pressing pills. Once inside the Dove Avenue residence, Taylor initiated a Facetime video call with CRI 5, which was recorded. During the call, Taylor told CRI 5 that the heavy industrial pill press was "on its last leg…bolts stripping," and Taylor needed to "break out another one." Investigators confirmed that the call occurred while Taylor was inside the residence through cell phone location information as well as a review of call logs.

Taylor stayed inside the Dove Avenue residence for approximately three hours before traveling to the residence at Stockbridge Avenue, where Taylor entered and exited the residence alone a mere four minutes later. Taylor then traveled to the residence at East 134th Street and stayed for five minutes before traveling back to the Dove Avenue address. Taylor stayed at the Dove Avenue address for one hour before traveling to the Ridgewood Drive address for the evening.

11

**J.      Taylor's Purchase of Drug Making Supplies and Trash Pull**

On March 14, 2024, investigators followed Taylor as he traveled to a Home Depot in Maple Heights where Taylor entered and exited with a bag. Taylor then drove directly to the Dove Avenue address and entered the residence with the bag from Home Depot. Taylor stayed inside the residence for approximately twelve hours.

Investigators returned to the Home Depot where they obtained video surveillance as well as Taylor's receipt from his March 14, 2024, purchase. Investigators confirmed that Taylor purchased a full-body Tyvek suit, a Tyvek head cover, and plastic shoe covers, all items commonly used by drug traffickers to protect them during the manufacturing of narcotics, specifically fentanyl.

Additionally, on the same day as the Taylor's Home Depot visit, investigators conducted a trash pull of the Dove Avenue residence. They found three plastic tear offs with an unknown residue and mail addressed to Michael Anderson. Through his training and experience, the Affiant knows plastic bag tear offs as indicative of individuals packaging drugs for re-sale possessing narcotics that were intended for resale.

**K.      Additional Surveillance on Taylor in March 2024**

On March 15, 2024, investigators followed Taylor as he traveled from the Ridgewood Drive address to the Stockbridge Avenue for a short visit before traveling to the Dove Avenue address, where he remained for approximately two hours. Afterwards, Taylor traveled to the East 134th Avenue address, then to Taylor's Bar before returning to Ridgewood Drive residence for the night.

On March 19, 2024, Taylor followed a similar pattern as the previous surveillance day, except on this day, Taylor engaged in intensive countersurveillance methods while driving but driving only on side streets and an additional six miles before circling back to the Stockbridge

Avenue residence. Taylor then entered the Stockbridge Avenue residence and exited two minutes later. Taylor then drove to the East 134th Street residence where Taylor entered the residence while carrying a large heavy bag. Shortly thereafter, Taylor's known co-conspirator and courier with an extensive criminal history arrived. A subsequent cell phone location warrant obtained on March 20, 2022, of that courier phone revealed that the courier made same day trips to New York back to Cleveland. Toll records showed that this courier kept in contact with Taylor during these out of state trips.

Between March 20 and March 26, 2024, surveillance showed Taylor make daily trips from Ridgewood Drive to Stockbridge Avenue and then to East 134th Street. There, investigators observed Taylor having suspected drug transactions with drug customers while in Taylor's vehicle. Taylor then returned to the Stockbridge Avenue residence before returning to Ridgewood Drive residence.

### L.     Fourth Controlled Buy

In late March 2024, Investigators set up another controlled buy with CRI 5 to pay off a previous debt and purchase more fentanyl. Consistent with the other buys, investigators searched CRI 5, and provided pre-recorded buy money to pay off the previous buy as well as an audio/video recording device. Investigators set up surveillance around the East 134th Street residence while other officers followed CRI 5 directly to the residence. Meanwhile, different investigators followed Taylor from his residence at Ridgewood Drive as Taylor drove directly to the East 134th Street residence and arriving before CRI 5 arrived at the residence. CRI 5 then arrived and entered the residence while Taylor stayed outside in his vehicle. Inside the residence, Young told CRI 5 that Taylor was outside in his vehicle and CRI 5 could obtain the fentanyl from Taylor. CRI 5 exited the residence and signaled to Taylor to come inside. Taylor exited his vehicle and entered the residence. Once inside, CRI 5 gave Taylor the buy money and Young

13

retrieved the fentanyl and gave it to Taylor, who then gave it to CRI 5. Taylor then spoke to CRI 5 extensively about his plan to obtain large quantities of narcotics very soon and Taylor's plan to not pay the source for the narcotics. CRI 5 then departed the residence and traveled directly to debriefing location, where CRI 5 handed investigators the narcotics and was subsequently searched. A field-test confirmed that the narcotics contained fentanyl, with an approximate weight of 620 grams. Investigators maintained constant surveillance on CRI 5 throughout the controlled buy and reviewed the covert audio/video recording and found it to be consistent with what was observed that day.

### M.    Traffic Stop on March 26, 2024

On March 26, 2024, investigators saw Taylor enter the Stockbridge Avenue residence. He stayed for 20 minutes and then left and drove directly to the East 134th Street address. There, before Taylor's arrival, investigators saw two vehicles arrive and two individuals enter the residence. Taylor then arrived and went into the house. Another vehicle arrived and the occupant entered the residence. The two people who arrived earlier exited and left the area. Taylor also exited the residence and sat in his vehicle while another person arrived in a vehicle and entered the residence. Shortly thereafter, investigators saw Michael Fannin exit the residence and acknowledge Taylor who still inside his vehicle. Fannin then drove away while investigators maintained constant surveillance on Fannin's vehicle. Shortly thereafter, Garfield Heights police conducted a traffic stop on Fannin's vehicle, where a K9 alerted to the presence of narcotics during an open-air sniff.  During a search of Fannin's vehicle, officers found a bag containing a brown powdery narcotics-like substance behind the front driver seat, 2 pounds of suspected marijuana, a loaded firearm, and over $2,000 in cash. While the powdery substance could not be field-tested, the K9 used during the stop was not trained to alert to marijuana.

In Affiant's training and experience, investigators observations of increased foot traffic at the East 134th Street residence after Taylor's arrival, along with the traffic stop above where suspected narcotics were found, is consistent with drug trafficking by Taylor at the residence.

### N.    Execution of the Warrants

After completing all the investigative methods above, which included detailed daily physical and ariel surveillance observations, multiple informant tips, multiple controlled buys, GPS location data, cell phone tolls and location information, Taylor's purchase of drug making equipment, a trash pull, and a traffic stop, investigators obtained four residential search warrants which were executed on April 1, 2024.

At the first location searched, i.e. East 134th Street, Investigators found Taylor present, who was immediately detained. Upon seeing police, Young ran inside the residence and slammed the door. After a few minutes, Young jumped out of a second-floor window and escaped. Inside the residence, investigators found another co-conspirator (the same target that was previously interviewed and provided information about Taylor) on the first floor. In the bathroom, investigators found numerous kilogram wrappers torn open and fentanyl powder all over the toilet seat. A search of the residence uncovered the following items:

a.  A loaded Smith & Wesson 9mm handgun on a couch in the living room,
b.  A loaded Taurus G2C 9mm handgun on a table in the living room,
c.  Approximately 10 grams of suspected fentanyl on a table in the living room,
d.  Approximately 10 grams of suspected fentanyl and pills on a shelf in the living room,
e.  3 cellphones, paperwork, 3 scales located on a table in the living room,
f.  U.S. currency on a table in the living room,
g.  Approximately 125 grams of suspected fentanyl in the SE 1st floor room,
h.  A social security card to Young located in the SE 1st floor room,
i.  Woodforest bank paperwork, a scale, and a phone located in the SW 1st floor bedroom,
j.  Suspected psilocybin mushrooms located in the SW 1st floor bedroom,
k.  Approximately 25-50 grams of suspected fentanyl out of kilo-wrapper on and around the toilet in the 1st floor bathroom,
l.  Approximately 75 grams of suspected fentanyl pills and powder located in the 1st floor bathroom,

      m.  Suspected kilo-wrappers located on the floor in the 1st floor bathroom.

At the Dove Avenue residence, investigators found Michael Anderson present, who cooperated with police and gave a voluntary statement. Investigators seized the following the following items:

    a.  Multiple presses, including a pill press, a kilogram press, a large industrial automatic pill press, and multiple other mechanical devices located upstairs,

    b.  Multiple Tyvek suits covered in blue fentanyl powder, multiple kilogram wrappers and gallon-sized Ziploc bags with residue, and a Home Depot receipt for the purchase of the suits from March 14, 2024. Detectives have surveillance video of Taylor making this purchase as well as surveillance of him bringing the suits into the residence,

    c.  Approximately 250 grams of suspected fentanyl powder located on seized machinery in the upstairs portion of the residence,

    d.  Approximately 1-2 kilograms of an unknown powder and 3 pounds of methamphetamine in multiple bags located in the wall of the upstairs SW bedroom,

    e.  Multiple kilogram wrappers and gallon-sized Ziploc bags located in the upstairs SW bedroom,

    f.  A kilogram press and Firmapress bag located in the basement,

    g.  A cellphone belonging to Michael Anderson located in the 1st floor living room.

At the Stockbridge Avenue residence, investigators found the owner Marcia Hawkins present.  Although investigators had a search warrant, Ms. Hawkins signed a written consent to search the residence for narcotics in addition to currency, records, and other documents. (*See* Gov't Ex. 5). In the basement of the residence, investigators seized the following items:

    a.  An opened kilogram package of cocaine

    b.  Hundreds of wax bindles (packaging)

    c.  Paperwork belonging to Thomas Taylor

    d.  7 individual kilogram wrappers with residue

    e.  Approximately 2 pounds of suspected marijuana

    f.  An unloaded shotgun.

Finally, at the Ridgewood Drive residence, investigators observed as Taylor's girlfriend attempted to leave the residence with more than $10,000 in cash and a money counter that she stated belonged to Taylor. Inside the residence, investigators seized the following items:

    a.  9mm ammunition located in the SE bedroom,

    b.  A loaded Glock 30s located in the SE bedroom,

     c.  Miscellaneous paperwork in the dining room,
     d.  Drug test strips located in the dining room,
     e.  A planner with other documents located in the NE bedroom,
     f.  4 phones located in the front passenger floor of the black Dodge Durango in the garage,
     g.  2 phones located in the GMC truck in the driveway,
     h.  Miscellaneous paperwork located in the NW 2nd floor office,
     i.  Miscellaneous paperwork located in the SE bedroom.

In total, despite some evidence being destroyed or removed by Taylor's co-conspirators, investigators several kilograms of narcotics as well as firearms, large sums of cash, and heavy-duty drug manufacturing equipment. (see photo below)



On April 7, 2024, six days after the execution of the warrants above, Michael Anderson was murdered by multiple gunshot wounds to the head while entering his Dove Avenue residence. The murder is being investigated as being connected to Taylor's DTO.

### O.      Procedural History

On May 1, 2024, a grand jury returned an indictment against Taylor charging him with Conspiracy to Distribute and Possess with Intent to Distribute a Controlled Substance, in violation of 21 U.S.C. §§ 846 and 841(a)(1) and (b)(1)(A). (R. 10: Indictment, PageID 33-34). A superseding indictment adding more charges was filed on June 27, 2024.

On June 17, 2024, Taylor filed a motion to suppress evidence seized from the four residences outlined above. (R. 18: Motion to Suppress, PageID 127-47). On June 26, 2024, Taylor filed an Amended Motion to Suppress adding additional arguments. (R. 20: Amended Motion, PageID 149-70).  Neither the Motion nor the Amended Motion contained any attachments, any sworn statements, any affidavits, or any other evidence outside of bare arguments within the filings.  Specifically, the motion asserts that the search warrant affidavit lacked probable cause between the criminal activity and the residences to be searched. The motion also alleges that Taylor's Fourth Amendment rights were violated when he was arrested without an arrest warrant. Further, the motion alleges that the affidavit knowingly contained false information and requests a *Franks* hearing.

Taylor lacks standing to challenge the search warrants in this case, as he does not live, own, or stay at any of the residences except the Ridgewood Drive address, which he disavows connection to in his motion to suppress. Further, even if Taylor had standing, investigators provided ample evidence in the expansive and detailed affidavits provided to support the searches of each residence. At a minimum, officers relied on the federal search warrants with reasonable good faith. Finally, motion provides zero evidence outside naked allegations to support the claim that evidence contained in the affidavits are false. As such, Taylor cannot make the substantial showing necessary to support a *Franks* hearing.

## II.    LAW AND ARGUMENT

### A.    Taylor Lacks Standing to Challenge the Search Warrants

Before a defendant can allege that evidence must be suppressed in a case, the defendant must demonstrate that *his* Fourth Amendment rights were violated by the challenged search or seizure." *United States v. Padilla*, 508 U.S. 77, 81, (1993). In order to allege that his Fourth Amendment rights were violated, a defendant must establish that he had a "legitimate expectation of privacy." *Hicks v. Scott*, 958 F.3d 421, 431 (6th Cir. 2020) (quoting *Rakas v. Illinois*, 439 U.S. 128, 144 (1978)). A legitimate expectation of privacy comes in two parts. First, the defendant "must have exhibited an actual (subjective) expectation of privacy." *Id*. Second, "that expectation must also be one that society is prepared to recognize as reasonable." *Id. see also United States v. Jenkins*, 743 F. App'x 636, 647 (6th Cir. 2018) (affirming the denial of a motion to suppress for lack of standing). Likewise, "[d]etermining that a defendant has Fourth Amendment standing is a prerequisite to granting a motion for a *Franks* hearing." *United States v. Mastromatteo*, 538 F.3d 535, 544 (6th Cir. 2008). Courts recognize expectations of privacy on a case-by-case basis, considering factors like the defendant's "proprietary or possessory interest in the place to be searched" and his "right to exclude others." *United States v. King*, 227 F.3d 732, 744 (6th Cir. 2000). Fourth Amendment rights "may not be vicariously asserted." *Rakas*, 439 U.S. at 133-34 (quoting *Alderman v. United States*, 394 U.S. 165, 174 (1969)). The burden of establishing standing rests on the person challenging the search. *United States v. Smith*, 263 F.3d 571, 582 (6th Cir. 2001).

In this case, Taylor clearly has no proprietary or possessory interest or right in the residences owned and occupied by other individuals. Specifically, Michael Anderson was the sole occupant and owner of the Dove Avenue residence, Noreece Young was the sole occupant of East 134th Street residence, and Marcia Hawkins and her family were the sole occupants and

owners of the Stockbridge residence. In addition, Taylor was only present at those locations at the consent of the owners; Taylor never lived or stayed as an overnight guest at any of these locations. *See Minnesota v. Carter,* 525 U.S. 83, 90 (1998) ("an overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not."). Instead, with the consent of the owners, Taylor used the residences to store, manufacture or sell narcotics, apart from where Taylor physically lived and stayed every night. Indeed, that was the point of Taylor's operation: to create distance between Taylor and his drug trafficking activities. Even so, at no point did Taylor have exclusive control over the residences or show that he could exclude others from the residences. *See United States v. Rogers*, 97 F.4th 1038, (6th Cir. 2024) (finding no standing to a vehicle where Rogers did not have "complete dominion and control" over the car)(quoting *Rakas*, 439 U.S. at 149).  Thus, the only individuals that have standing to challenge the searches were Michael Anderson (who was likely murdered by the Taylor DTO), Noreece Young (who is a fugitive), and Marcia Hawkins (who gave consent to search). Accordingly, Taylor cannot establish a reasonable expectation of privacy in other persons' residences that were searched pursuant to search warrants.

With respect to the Ridgewood Drive address, evidence supported through surveillance, records checks, and GPS and cell site location data did show that Taylor stayed there every single night, and therefore Taylor would have a privacy interest in that residence. However, as indicated in his motion, Taylor defeats his own subjective expectation of privacy by disavowing any connection to the residence. *See United States v. McKennon*, 814 F.2d 1539, 1546 (11th Cir. 1987) ("[R]epeated disclaimers of ownership for to a search generally preclude assertions of privacy interests."); *see also United States v. Tolbert*, 692 F.2d 1041, 1045 (6th Cir. 1982) (defendant's actions and disclaimers may defeat any subjective expectation of privacy).

As Taylor has no standing to challenge the searches in this case, this court should deny Taylor's motion without a hearing.

### B.    Probable Cause to Search

Assuming arguendo that Taylor did have standing, Taylor's motion still fails as the searches were supported by detailed evidence that established significantly more than probable cause to believe evidence of a crime would be present at each residence.

The burden of proof or persuasion rests with the party seeking to suppress the evidence. *Rakas,* 439 U.S. at 130 n.1 (citing *Simmons v. United States*, 390 U.S. 377, 389-90 (1968) and *Jones v. United States*, 362 U.S. 257, 261 (1960)).  Thus, the defendant must make a *prima facie* case of a Fourth Amendment violation.  *United States v. Murrie*, 534 F.2d 695, 698 (6th Cir. 1976).  After making this showing, the burden of proof is upon the government to show by a preponderance of the evidence that the search was reasonable under the Fourth Amendment.  *See United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence.").

Search warrants must be supported by probable cause, which the Supreme Court has often noted, "is not a high bar to clear." *See*, e.g. *Kaley v. United States*, 571 U.S. 320, 337 (2014).  In other words, there must be a "fair probability that contraband or evidence of a crime will be found in a particular place."  *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  A warrant's validity does not turn on whether it is supported by an "actual showing" of criminal activity at the targeted location, *United States v. Christian*, 925 F.3d 305, 311-12 (6th Cir. 2019). Rather, the question is whether officers provided direct or circumstantial support to create "more than mere suspicion" that contraband will be found at the location in question. *United States v. King*, 227 F.3d 732, 739 (6th Cir. 2000) (citation omitted). Likewise, we do not ask whether other

investigative methods were available to officers. *See Christian*, 925 F.3d at 310 (recognizing that while the affidavit at issue could have been "more precise," we do not hold it to such an "exacting degree of specificity"). Ultimately, courts must determine whether the "chosen means of investigation produced information that, as detailed in a warrant affidavit, adequately supports a finding of probable cause." *See United States v. Sanders,* 2024 U.S. App. LEXIS 15832, 106 F.4th 455 (6th Cir 2024) (en banc). In doing so, courts must ask what good qualities it contains, not "what it lacks." *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000) (en banc).

"The duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed." *Id.* (quoting *Jones*, 362 U.S. at 271).  In assessing whether that standard is met, reviewing courts pay "great deference to the finding of the probable cause by the state court judge issuing a warrant." *United States v. McLevain*, 310 F.3d 434, 439 (6th Cir. 2002); *see also United States v. McPherson,* 469 F.3d 518 (6th Cir. 2006) ("[t]his court pays great deference to the determinations of probable cause made by a state magistrate."). Accordingly, the district court should "overturn that decision only if the [issuing judge] arbitrarily exercised" the judge's authority. *United States v. Christian*, 925 F.3d 305, 311-12 (6th Cir. 2019).

When a warrant is supported by an affidavit, "[c]ourts should review the sufficiency of the affidavit in a commonsense, rather than hypertechnical manner." *United States v. Greene*, 250 F.3d 471, 479 (6th Cir. 2001).  Furthermore, courts should evaluate an affidavit "holistically, examining the totality of the circumstances and employing a healthy dose of common sense." *Id*. Thus, if an inference is obvious from the factual context, a reviewing court should indulge it. *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000) (en banc).

### C.     Each Search Warrant Was Supported by Probable Cause.

The affidavits in this case contained specific facts supporting a fair probability that there was evidence of drug trafficking activity at each of the four residences. The investigation here detailed daily physical and ariel surveillance observations across several months all consistent of drug trafficking activity, verified statements from five confidential reliable informants and two drug traffickers, four successful controlled buys with Taylor involved in each transaction, expansive 24/7 GPS tracking data, cell phone tolls and cell site location information, documented purchases of drug making tools, a trash pull, a traffic stop, and observed hand-to-hand transactions involving Taylor. Despite all this, Taylor perplexingly argues that all the searches were based merely on Taylor's status as a drug dealer and that no nexus was established between any of the residences and Taylor's drug trafficking activities. A review of the facts related to each residence plainly refutes that bare claim.

"[A] nexus exists between a known drug dealer's criminal activity and the dealer's residence when some reliable evidence exists connecting the criminal activity with the residence." *United States v. Gunter*, 266 F. App'x 415, 419 (6th Cir. 2008). Such reliable evidence, however, does not require that "anyone ever purchase drugs directly from the [drug dealer's] residence...." *United States v. Jenkins*, 743 F. App'x 636, 644 (6th Cir. 2018).  Probable cause does not require an actual showing of criminal activity at a particular location, but a "probability or substantial chance of criminal activity." *United States v. Davidson*, 936 F.2d 856, 859 (6th Cir. 1991).  In each instance, Taylor's use of each of the residence in connection with criminal activity supported the probable cause to search the residences.

#### 1.     Dove Avenue Residence

Contrary to Taylor's overly simplistic analysis, probable cause to search the Dove Avenue residence was not only based on Taylor's status as a drug dealer, physical surveillance, a

trash pull, and conversations with CRI 5. Rather, over several months, and in connection with the controlled buys, investigators utilized physical and aerial surveillance, GPS data, and cell site location data to establish a pattern showing that Taylor used Dove Avenue to make and store drugs before moving it to East 134th Street to complete the sales. In each instance, Taylor communicated before and after the controlled buys with CRI 5, strengthening Taylor's direct involvement with the controlled purchases as Taylor moved the narcotics from Dove Avenue. Further, in several other recorded calls, Taylor admitted that he was pressing fentanyl pills during the time when Taylor's GPS and phone location data showed Taylor at the Dove Avenue address. In addition, through information obtained from reliable informants, co-conspirators who were known to assist Taylor with the pill press were also observed entering the Dove Avenue residence with Taylor. Similarly, before the search, investigators confirmed that Taylor purchased drug making equipment from Home Depot and then traveled directly to the Dove Avenue address. Finally, a trash pull from the residence revealed tear-offs with residue that are commonly used in bagging drugs into smaller portions for sale. Thus, under a holistic totality of circumstances approach, ample evidence existed to support the common-sense conclusion that evidence of drug trafficking would be found at the Dove Avenue residence.

In his motion, Taylor repeatedly cites an unpublished Sixth Circuit case, *United States v. Westley*, 2023 U.S. App. LEXIS 22357 (6th Cir. August 22, 2023), as well as *United States v. Sheckles*, 996 F.3d 330 (6th Cir 2021), for the errant proposition that evidence must be suppressed in this case. The investigations in those cases were far less developed than the instant case here. For example, *Westley* involved a brief investigation involving a single controlled buy, a single trash pull, a criminal history check, and a residential records search. *Westley*, 2023 U.S. App. LEXIS 22357 at *2. Similarly, in *Sheckles,* officers had limited evidence connecting Sheckles to two residences, as well as evidence that Sheckles discussed acquiring ten kilograms

24

of cocaine that Sheckles ultimately never obtained. *Sheckles,* 996 F.3d at 340. Even so, the Sixth Circuit in both cases found a substantial basis existed to support the state judge's finding that probable cause existed to search the residences, even with the limited evidence before it.

In contrast, the affidavit outlined an expansive investigation that established probable cause to believe that Taylor used the Dove Avenue address for making and storing narcotics. Accordingly, this court should deny Taylor's motion.

### 2.      East 134th Street Residence

In his motion, Taylor acknowledges that East 134th Street residence was where all four controlled purchases occurred, but challenges that Taylor had anything to do with the controlled buys. Taylor's position again is unsupported by the facts. Indeed, each of the four controlled buys was coordinated directly with Taylor and documented in recorded calls, even if Taylor was not physically present at each transaction. That is, CRI 5 spoke to Taylor, who agreed to sell the narcotics and told CRI 5 that the drugs would be left at East 134th Street residence, and on occasion, Taylor spoke with CRI 5 during and after the controlled buys. Finally, with the fourth controlled buy at the residence, Taylor physically handed a "mere" 620 grams of fentanyl directly to CRI 5 while investigators watched. This along with Taylor's tracked movements to East 134th Residence directly before each of the controlled buys along with the more than 3 kilograms of fentanyl sold at the residence plainly supported probable cause to search the residence.

Moreover, the fact that Taylor argues no personal connection to residence or the controlled buys, search warrants are not tied to persons, but rather places, and probable cause existed to search the residence where significant drug sales occurred. *See United States v. Ellison*, 632 F.3d 347, 350-51 (6th Cir. 2011) ("[s]earch warrants are not directed at persons; they authorize the search of place[s] and the seizure of things, and as a constitutional matter they

25

need not even name the person from whom the things will be seized."). Accordingly, this court should deny Taylor's motion.

### 3.      Ridgewood Drive Residence

At the outset, Taylor challenges the search of the Ridgewood Drive address for narcotics but fails to appreciate that the search warrant in that residence did not authorize a search for narcotics, but rather currency, phones, books, records, receipts, logs, ledgers, and other documents. (*See Gov't Ex. 3,* pg. 30). As such, Taylor's arguments challenging a search for narcotics at this residence is inapplicable here.

With respect to the evidence investigators were seeking at Taylor's residence, the Sixth Circuit has long held that "in the case of drug dealers, evidence is likely to be found where the dealers live." *United States v. Davidson*, 936 F.2d 856, 860 (6th Cir. 1991) (citation omitted); *see also United States v. Jones*, 159 F.3d 969, 975 (6th Cir. 1998); *see also United States v. Sanders,* 2024 U.S. App. LEXIS 15832, 106 F.4th 455 (6th Cir 2024) (en banc) (recognizing the long history of holding the same, noting "in taking this approach, we stand in good company.")(citations omitted); *see also United States v. Miggins*, 302 F.3d 384, 393-94 (6th Cir. 2002) (citing to ten cases concluding that drug dealers often possess evidence in their residences); *see also United States v. Newton*, 389 F.3d 631 (6th Cir. 2004), vacated on other grounds, 546 U.S. 803, 126 S. Ct. 280, 163 L. Ed. 2d 35, (2005) (finding that the fact that a defendant is a drug dealer with "continuing and ongoing operations" in and of itself creates probable cause to search his home.).[2]

---

[2] *See also United States v. Castro,* No. 1:07CR360, 2008 U.S. Dist. LEXIS 121723 (N.D. Ohio May 7, 2008)(citing these and other Sixth Circuit cases and assessing the "minimal connection" required to search a drug dealer's home).  The Sixth Circuit has also stated that the magistrate judge who issues the search warrant "may infer that drug traffickers use their homes to store drugs and otherwise further their drug trafficking." *United States v. Williams*, 544 F.3d 683, 687 (6th Cir. 2008); s*ee also LaFave*, supra § 3.7(d) (cited in *Sanders*, 2024 U.S. App. LEXIS 15832,

Here, Taylor argues that "there is insufficient evidence to establish that Mr. Taylor was engaging in the ongoing distribution of narcotics" and that the affidavit "failed to sufficiently confirm that the Ridgewood residence was indeed Mr. Taylor's residence." (R. 20: Amended Motion, PageID 155-56).  However, the affidavits here clearly established that Taylor was an active and significant drug trafficker. First, the affidavit identified five different confidential reliable informants that provided essentially the same information – Taylor was actively selling drugs in the Kinsman area. As outlined above, the affidavit documented numerous controlled buys where Taylor supplied the drugs for pickup and recorded phone calls where Taylor discussed pressing pills and selling drugs. The affidavit also provided GPS and ping data that supported the physical surveillance and recorded phone calls. This coupled with Taylor's active participation in four controlled buys conclusively showed that Taylor was heavily involved in trafficking narcotics.

Additionally, the affidavit established that Taylor lived at Ridgewood Drive, despite his current disclaimers. Taylor further attempts to rely on *United States v. Westley*, No. 22-3356, 2023 U.S. App. LEXIS 22357 (6th Cir. Aug. 22, 2023) which questioned the reliability of a CLEAR report that law enforcement used to obtain Westley's address. Unlike *Westley* though, the affidavit here provided more information to support the fact that Taylor resided at Ridgewood Drive. Specifically, the affidavit included GPS data and physical surveillance that showed that for nearly three months, Taylor always returned to Ridgewood Drive every night and departed from there every morning indicating that Taylor resided there.

---

*17-18 ("[M]any courts have been disinclined to require such facts in the particular case to support that inference. Rather, it is commonly held that this gap can be filled merely on the basis . . . that drug dealers ordinarily keep their supply, records and monetary profits at home.")

The affidavit here contains ample information indicating that Taylor possessed evidence of his drug trafficking activity at his home at Ridgewood Drive. Taylor began each day at the residence, and on occasion traveled directly from Ridgewood Drive to East 134th Street to drop off narcotics, which is exactly what Taylor did during the fourth controlled buy.  At a minimum, given Taylor's strong connection to the Ridgewood Drive address, evidence supported that Taylor would likely retain drug records, phones, and drug proceeds at his residence in order to protect it from other drug dealers and customers. Accordingly, as now Justice Kavanaugh noted:

> Common experience suggests that drug dealers must mix and measure the merchandise, protect it from competitors, and conceal evidence of their trade— such as drugs, drug paraphernalia, weapons, written records, and cash—in secure locations. For the vast majority of drug dealers, the most convenient location to secure items is the home. After all, *drug dealers don't tend to work out of office buildings*. And no training is required to reach this commonsense conclusion.

*See Sanders*, 2024 U.S. App. LEXIS 15832, *17-18, (emphasis added) *(*quoting *United States v. Spencer*, 530 F.3d 1003, 1007 (D.C. Cir. 2008)).

Thus, as evidence clearly established Taylors ongoing drug trafficking operation and connection to the residence, a search for drug records, phones, and drug proceeds was supported by probable cause. Once inside the residence, investigators could have also seized other evidence not described in the search warrant under the plain view doctrine. *See United States v. Loines*, 56 F.4th 1099, 1106 (6th Cir. 2023) (quoting *United States v. Mathis*, 738 F.3d 719, 732 (6th Cir. 2013)). Accordingly, this court should deny Taylor's motion.

### 4.      Stockbridge Avenue Residence

Finally, like the other residences, Taylor contends that "law enforcement failed to sufficiently confirm that the Stockbridge residence was indeed Mr. Taylor's residence." (R. 20: Amended Motion, PageID 159). As with the other residences, Taylor's own arguments supports that Taylor lacks standing to challenge the search of this residence.

Further, similar to the Ridgewood Drive residence, investigators sought authorization to search the Stockbridge Avenue residence not for narcotics, but rather for currency, phones, books, records, receipts, logs, ledgers, and other documents. (See Gov't Ex. 4, pg. 47). The evidence supporting the search for such items originates from reliable information that Taylor used Stockbridge Avenue as a "money house." Physical and aerial surveillance plainly showed that over the course of two months, Taylor regularly traveled to the Stockbridge Avenue residence for very short visits, often multiple times a day, and often in connection with the sale of narcotics. This evidence, coupled with the GPS data, cell site location information, controlled buys, and recorded conversations directly with Taylor plainly showed that evidence of Taylor's drug trafficking activity would be found at the residence, specifically drug proceeds and records. *See United States v. Coffee*, 434 F.3d 887, 892 (6th Cir. 2006) (recognizing that warrant affidavits "[m]ust be tested and interpreted by magistrates and courts in a commonsense and realistic fashion" (quoting United States v. Ventresca, 380 U.S. 102, 108 (1965))).

In addition, after law enforcement arrived at the residence, they obtained written consent to search the house from the owner, Marcia Hawkins. "Where valid consent is given, a search is permissible under the Fourth Amendment even without a warrant or probable cause." *United States v. Morgan*, 435 F.3d 660, 663 (6th Cir. 2006). Before searching the house, Hawkins signed a Consent to Search form. (*See* Gov't Ex 5). By signing the form, she agreed to a "complete search" of the house and agreed that she was advised of her right to refuse, gave permission voluntarily, and authorized agents to "take any items which they determine may be related to their investigation." (*Id.*). Not only did law enforcement have a search warrant granting authority to search Stockbridge Avenue for drug proceeds and related documents, but they also had signed consent by the owner to search the house for all items. Accordingly, Taylor's motion to suppress evidence must be denied.

29

### D.      The Good-Faith Exception Applies

Even if Taylor had standing to challenge the warrants, which he does not, and Taylor sufficiently showed that the warrants lacked probable cause, which he cannot, his motion should still be denied, because a law enforcement officer "with objective good faith obtained a search warrant from a judge or magistrate and acted within its scope."  *United States v. Leon*, 468 U.S. 897, 920 (1984).  *Leon* determined, "the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." *Id.* Further, in providing for a good-faith exception to a deficient warrant, courts reason that any possible "error in the probable cause calculus likely belongs to the judicial officer issuing the warrant, not the law enforcement officer seeking it." Davis, 564 U.S. at 239. Thus, courts do not expect an officer to second guess a judge's probable cause determination, given both the nature of the inquiry and the judicial officer's role in undertaking it. *Leon*, 468 U.S. at 921.

The *Leon* Court took pains to "emphasize" that the "standard of reasonableness we adopt is an objective one." *Id.* at 919 n. 20. *See also Davis v. United States*, 564 U.S. 229, at 238-39 (2011); *United States v. Brooks*, 594 F.3d 488, 496 (6th Cir. 2010); *United States v. Frechette*, 583 F.3d 374, 381 (6th Cir. 2009). This exception to the exclusionary rule does not apply, however, if:

> (1) "if the magistrate or judge in issuing a warrant was misled by information in an affidavit" that violated *Franks*; (2) "where the issuing magistrate wholly abandoned his judicial role;" (3) when the warrant is "based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;'" and (4) when a warrant is "so facially deficient— i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid."

*Id.* at 923 (quoting *Brown v. Illinois*, 422 U.S. 590, 610-11, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975) (Powell, J., concurring)). None of those factors are present here.

In his motion, Taylor argues the "barebones" affidavits were "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." Taylor's argument defies fact and logic, as the Affiant painstakingly drafted and provided the U.S. Magistrate Judge a total of 133 affidavit pages to support the warrants in this case. Taylor further plainly fails to appreciate that the standard for "indicia of probable cause" is not the same as the standard for probable cause to support a search warrant.  On this issue, the Sixth Circuit agreed with the Fourth Circuit's analysis:

> If a lack of a substantial basis also prevented application of the Leon objective good faith exception, the exception would be devoid of substance. In fact, *Leon* states that . . . a finding of objective good faith [is inappropriate] when an officer's affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." This is a less demanding showing than the "substantial basis" threshold required to prove the existence of probable cause in the first place.

*United States v. Carpenter*, 360 F.3d 591, 595 (6th Cir.) (quoting *United States v. Bynum*, 293 F.3d 192, 195 (4th Cir. 2002).  Thus, the standard for good faith is extremely broad.  *See id*. at 595 ("If a lack of substantial basis also prevented application of the Leon good faith exception, the exception would be devoid of substance"; applying good faith exception "because the affidavit was not completely devoid of any nexus."). *See also United States v. Christian*, 925 F.3d 205, 313-314 (6th Cir. 2019).

Here, Taylor hopes this Court will twice apply his probable cause analysis and ignore *any* evidence of *any* nexus between Taylor's drug trafficking activities and the four residences, despite the numerous connections described above. He asserts that since Taylor "allegedly was present for one controlled buy, in which 620 grams of narcotics were purchased," the affidavits "do not identify even a minimally sufficient probable-cause nexus." (R. 20: Amended Motion,

PageID 165). This argument fails because even "a single controlled purchase is sufficient to establish probable cause to believe that drugs are present at the purchase location." *United States v. Archibald*, 685 F.3d 553, 558 (6th Cir. 2012); *see also United States v. Jackson*, 470 F.3d 299, 308 (6th Cir. 2006) (holding that there was probable cause for the issuance of a search warrant where the officer's "corroboration of events that occurred during the controlled buy, as set forth in the affidavit, provide sufficient probable cause").

In sum, Taylor's argument falls well short of the purpose of good faith exception, especially in a case where evidence clearly shows objective good faith by law enforcement conducting an extensive criminal investigation. *See Davis v. United States,* 564 U.S. 229, 241 (2011) ("the harsh sanction of exclusion 'should not be applied to deter objectively reasonable law enforcement activity.'").

Accordingly, even if this Court believes that the search warrant lacked probable cause, it should still deny Taylor's motion under the good faith exception.

> **E.** **A *Franks* hearing is unwarranted because Taylor has failed to meet his "heavy burden" to make a substantial showing of deliberately or recklessly false information in the affidavits.**

Under *Franks v. Delaware*, 438 U.S. 154, 171 (1978), a presumption of validity exists with respect to the affidavit supporting the search warrant." Whether to hold an evidentiary hearing based upon a challenge to the validity of a search warrant's affidavit, given alleged misstatements and omissions, is committed to the sound discretion of the district court." *See United States v. Young*, 847 F.3d 328, 348 (6th Cir 2017). A defendant challenging the validity of a search warrant's affidavit bears a "heavy burden." *Franks*, 438 U.S. at 171. A defendant is entitled to an evidentiary hearing on the truthfulness of the affidavit "*if and only if*" the defendant can first present a "substantial preliminary showing that specified portions of the affiant's averments are deliberately or recklessly false." *United States v. Campbell*, 878 F.2d 170, 171

(6th Cir. 1989)(emphasis added); *United States v. Moncivais*, 401 F.3d 751, 757 (6th Cir. 2005); *see also United States v. Archibald*, 685 F.3d 553, 558 (6th Cir. 2012) ("*Franks v. Delaware*, . . . mandates that a defendant "first provide a substantial preliminary showing that a false statement was made either knowingly or intentionally, or with reckless disregard for the truth." (internal citation omitted) (quoting *United States v. Mastromatteo*, 538 F.3d 535, 545 (6th Cir. 2008)). "Only after the defendant makes this showing may the court consider the veracity of the statements in the affidavit or the potential effect of any omitted information. Without this substantial showing, courts may not make a *Franks* ruling regarding the veracity of statements made in an affidavit." *Archibald*, 685 F.3d at 558-59 (internal citation omitted).

In order to obtain a *Franks* hearing, a defendant must: (1) make a substantial preliminary showing that the affiant knowingly and intentionally, or with reckless disregard for the truth, included a false statement or material omission in the affidavit; and (2) prove that the false statement or material omission is necessary to the probable cause finding in the affidavit. *Young*, 847 F.3d at 348. The Sixth Circuit has elaborated upon the *Franks* standard as follows:

> A defendant who challenges the veracity of statements made in an affidavit that formed the basis for a warrant has a heavy burden. His allegations must be more than conclusory. He must point to specific false statements that he claims were made intentionally or with reckless disregard for the truth. He must accompany his allegations with an offer of proof. Moreover, he also should provide supporting affidavits or explain their absence. If he meets these requirements, then the question becomes whether, absent the challenged statements, there remains sufficient content in the affidavit to support a finding of probable cause.

*United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990) (citations omitted).

In his motion, Taylor imprecisely and generally contends that the Affiant knowingly and intentionally included false statements regarding Taylor's ongoing drug trafficking activity in an attempt to bolster the probable cause nexus. Taylor disputes the facts contained in the affidavit without providing any evidence whatsoever to call into question any single fact contained in the affidavit. See *Young*, 847 F.3d at 348-49 (recognizing that a defendant must do more than make

a bald allegation that an officer was intending to mislead the issuing judge); *United States v. Damrah*, 412 F.3d 618, 625, 124 Fed. Appx. 976 (6th Cir. 2005) (rejecting a "non-specific and unsupported" Franks attack). In short, as well established by the Sixth Circuit, a "vague, conclusory assertion falls well short of a 'substantial preliminary showing' that the affidavit contains a knowing, intentional, or reckless falsehood*." United States v. Sanders*, 2024 U.S. App. LEXIS 15832, *33-34.

The Sixth Circuit's well-settled framework for *Franks* hearings requires a defendant to "point to specific false statements" and then "accompany his allegations with an offer of proof." *United States v. Cummins*, 912 F.2d 98, 101, 103 (6th Cir. 1990) (emphasis added) (independently evaluating the defendant's offer of proof in support of his *Franks* claim and concluding that he "has failed to meet his burden of proof in establishing deliberate falsehood or reckless disregard for the truth"). Taylor has failed to make a substantial preliminary showing of intentional or reckless falsity and has not provided any proof that the affidavit contained such statements.

Taylor has simply done absolutely nothing to call into question the veracity of the affidavit, much less provided any evidence to make *any* showing that the statements contained in the affidavit were intentional or knowingly false. Thus, because Taylor has failed to meet any requirements to show he's entitled to a *Frank* hearing, this court should decline to hold a *Franks* hearing and further deny his motion.

## III. CONCLUSION

For the foregoing reasons the government respectfully requests that this Honorable Court deny Taylor's Motion to Suppress without a hearing.

Respectfully submitted,

REBECCA C. LUTZKO
United States Attorney

By:    /s/ Payum Doroodian
       Payum Doroodian (DC: 1035376)
       Assistant United States Attorney
       United States Court House
       801 West Superior Avenue, Suite 400
       Cleveland, OH 44113
       (216) 622-3739
       (216) 522-7499 (facsimile)
       Payum.Doroodian@usdoj.gov